**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 98-20757
Summary Calendar
_____


JO ANN MOODY,

Plaintiff-Appellant,

VERSUS

THE M.W. KELLOGG COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
(H-95-CV-3848)
_____

March 8, 1999

Before JOLLY, SMITH, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


Jo Ann Moody appeals a summary judgment in favor of M.W. Kellogg Company ("Kellogg" or "the company") on her claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Texas Workers' Compensation Act ("TWCA"), TEX. LABOR CODE § 451.001 *et seq.* Finding no genuine issue of material fact, we affirm.

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Moody worked for Kellogg from 1976 to 1991, receiving several promotions and ultimately attaining the position of lead document coordinator (a "Clerk VII" position in Kellogg's employment scheme), responsible for supervising four employees. Kellogg requires its employees to maintain weekly time sheets, which must be verified and approved by supervisors. When the document supervisor was unavailable, Moody was responsible for approving the time sheets of her supervisees.

Moody injured her back at work on three separate occasions. Two of the injuries required surgery, and after each injury, she sought and received workers' compensation. Following the third injury, her doctor suggested that she receive a specially designed chair and a parking spot close to the building. Kellogg supplied a special chair, but she never got to use it because, as detailed below, she was fired upon her return to work. Kellogg denied the request for a closer parking spot, claiming that Moody's doctor had said only that a closer spot was recommended, not required.

During Moody's third medical leave, Carol Jones, an employee Moody supervised, confessed to falsifying time sheets at Moody's request. Kellogg conducted an investigation of Jones's allegation. The investigation was led by Doris Frisby, who is the supervisor of the employee to whom Jones confessed, and Teresa Vannoy, manager of employee relations, who determined that (1) Jones is a credible person, (2) the altered time sheets corroborated Jones's allegations that Moody had marked and revised the number of hours

worked, and (3) the parking garage records corroborated Jones's allegations that Moody had left Kellogg's premises during the work day.  In addition, Vanessa Reed, another employee in Moody's work group, stated that Moody had told Reed to add hours to her time sheet that Reed had not actually worked.

On the basis of Jones's and Reed's statements and the corroborating evidence, Frisby made the decision to terminate Moody's employment.  She was fired on September 6, 1994, her first day back to full-time work after her third back injury.  The reason for her discharge, Kellogg claims, is that she abused her supervisory positionSSin particular, she directed subordinate employees to submit inaccurate time sheets in violation of Kellogg's policies and procedures.  Moody claims that this proffered reason for her termination is a pretext.


II.

Moody sued, asserting that Kellogg had violated her rights under the ADA by denying her reasonable accommodation (a special chair and close parking space) and terminating her because of her disability.  She claims the company violated the TWCA by firing her in retaliation for her filing of workers' compensation claims.

The court granted summary judgment for Kellogg.  Moody appealed, arguing that she had not been allowed to engage in sufficient discovery to contest summary judgment. We reversed and remanded for further proceedings.  After the parties had engaged in extensive discovery, the district court granted Kellogg's second

3

motion for summary judgment.

## III.

We review a summary judgment *de novo*, applying the same standard as did the district court. *Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 559 (5th Cir. 1997). Summary judgment is proper when the pleadings and summary judgment evidence present no genuine issue of material fact and indicate that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputed facts preclude granting summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We may neither weigh the evidence nor make credibility determinations. *Anderson*, 477 U.S. at 248.

## IV.

The ADA prohibits an employer from "discriminating against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). To state a claim under the ADA, Moody must prove that (1) she suffers from a "disability" as defined by the ADA; (2) she is a "qualified individual" under the ADA; and (3) Kellogg took an adverse employment action solely because of her disability. *Rizzo v. Children's World Learning Ctrs.*, 84 F.3d 758, 763 (5th Cir. 1996); *see also Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir. 1993). Moody bears the burden of proving each

4

of these elements.  Id.  Because she has produced no evidence to create a genuine issue of material fact as to the first and third elements, summary judgment was proper on the ADA claim.

A.

Moody has failed to produce evidence that would permit a rational juror to conclude that she suffers from a disability as defined by the ADA.  A person has a disability under the ADA if he (1) suffers "from a physical impairment that substantially limits one or more of [his] major life activities," (2) has "a record of such impairment," or (3) is "regarded as having such an impairment."  42 U.S.C. § 12102(2)(A)-(C).

1.

The evidence Moody has produced to show that she suffers from a physical impairment that substantially limits a major life activity is unpersuasive, for, while it shows that she has a bad back, it does not show that she is substantially limited in any major life activity.  The primary evidence she points to is her deposition testimony.[2]  She testified that her back injury caused

---

[2] Moody also references a memo from her doctor (Doctor McKeever) detailing how the injuries Moody sustained in her last fall would affect her work abilities.  The memo states:

> This patient will certainly need to limit any prolonged standing, stooping, bending or lifting.  She should not really lift anything weighing over about 10 lbs.  It would be recommended she obtain a parking space close to her job site.  It would be recommended that when she does have to sit down to operate her computer keyboard etc[.] that she have a special straight back chair with adequate lumbar support.  It would be recommended she have breaks to prevent prolonged standing

(continued...)

5

the following restrictions:  She does not play as many sports as she once did; she has difficulty putting on pantyhose or fastening a dress in the back; she has numbness in her leg and pain in her lower back *if* she stands "too long"; she has lower back pain *if* she walks "too far" or *if* she has to climb stairs; she uses her own judgment to decide what she is capable of lifting; and she has difficulty getting up and down while singing in her church choir. These restrictions on her physical abilities are not sufficient to constitute a substantial limitation of a major life activity.

The ADA does not define "substantially limits" or "major life activities," but we have looked to regulations promulgated under the act by the Equal Employment Opportunity Commission in defining both terms.   The regulations define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  "Other major life activities could include lifting, reaching, sitting, or standing." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 n.7 (5th Cir. 1995).  Moody

---

(...continued)
>    or sitting in one position.  Again, she should limit her bending or lifting of anything over 10 lbs.  I understand she has to deliver documents and drawings etc.  Sometimes these weigh quite a bit.  A rolling cart for such deliveries would be recommended.  If these precautions are taken and provided, I feel Mrs. Moody could perform her job and I know she wants very much to continue to do so.

By its terms, this memo is describing the results of a particular injurySSMoody's third fall.  It does not purport to describe a long-term disability. The regulations under the ADA distinguish injuries ("temporary, non-chronic impairments of short duration") and state that they "are usually not disabilities." 29 C.F.R. § 1630 app. at § 1630.2(j).  Read as a whole, the memo from McKeever plainly addresses injuries sustained in Moody's third fall and the restrictions she needed to observe as a result of those particular short-term injuries.  When read in conjunction with McKeever's deposition testimony, discussed in the text below, the memo cannot establish that Moody was substantially limited in a major life activity.

grasps onto these statements, arguing that because she has trouble putting on certain clothes ("caring for oneself") and must avoid walking too far, standing too long, and lifting objects that are too heavy, she must be substantially limited in a major life activity.

The limitations must be more significant than those Moody claims to experience. In *Ray v. Glidden*, 85 F.3d 227, 229 (5th Cir. 1996), we held that an ADA plaintiff was not substantially limited in a major life activity when he could not life heavy objects and his doctor had recommended that he be limited to lifting objects weighing from five to ten pounds. We stated that "[t]o determine whether a person is substantially limited in a major life activity other than working, we look to whether that person can perform the normal activities of daily living." *Id.* (citing *Dutcher*, 53 F.3d at 726). The plaintiff was not substantially limited, we held, because he "c[ould] lift and reach as long as he avoid[ed] heavy lifting." *Id.*[3]

Similarly, Moody can care for herself and can sit, stand, walk, and lift, as long as she avoids extremes. The summary judgment evidence therefore does not support a finding that Moody is substantially limited in a major life activity.[4]

---

[3] *See also Dutcher*, 53 F.3d at 726 (holding that ADA plaintiff was not substantially limited when she could perform tasks of everyday living and "c[ould] do lifting and reaching as long as she avoid[ed] heavy lifting and repetitive rotational movements").

[4] This conclusion is bolstered by the deposition testimony of Dr. McKeever, Moody's expert witness and treating physician, who admitted that Moody could bend to dress herself and could lift more than ten pounds and could walk a considerable distance. He even admitted that he had suggested that Moody "increase her
(continued...)

2.

Moody also cannot point to a record of disability to establish that she was "disabled" under the ADA. To have a record of a substantially limiting impairment, one must "ha[ve] a history of, or ha[ve] been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). While Moody has produced evidence of past *injuries*, she has produced no evidence of a history of *disability*. Evidence of past discrete injuries is insufficient, for "[t]he impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities." 29 C.F.R. § 1630 app. at § 1630.2(k). As noted above, there is a difference between a particular, temporary injury (such as a back injury resulting from a fall) and a substantially limiting impairment. *See* 29 C.F.R. § 1630 app. at § 1630.2(j). The records to which Moody points constitute a record of mere injuries, not of disability.[5]

---

(...continued)
activities, including walking, riding, exercising on a bicycle, and doing partial sit-ups." He agreed that she could stand for a period of time longer than 30 to 45 minutes and could stand for three or four days "if she had to."

In addition, McKeever testified that from 1987 to December 1995, Moody consistently rated a "seven or eight" on a scale on which 1 represents the most disabled patient with a back injury and 10 represents the healthiest back patient. Noting that Moody's condition has stabilized, he stated, "She's been able to go back to work. She's been able to live her life, you know, and do things in a reasonable manner." This testimony confirms that Moody "can perform the normal activities of daily living," which precludes a finding that she is substantially limited in a major life activity. *See Ray*, 85 F.3d at 229.

[5] The evidence Moody points to as constituting a record of disability includes:

(continued...)

8

Moody's contention that she can establish a record of impairment because she was hospitalized for back surgery in 1986 and 1987 is also unavailing. Citing *School Board v. Arline*, 480 U.S. 273, 281 (1987), Moody claims that "[an] employee may establish that she has a record of an impairment if the impairment was serious enough to require hospitalization." But she is reading *Arline* too broadly. The *Arline* Court held that a school teacher who had recurrent, acute tuberculosis that required hospitalization had a record of disability under the Rehabilitation Act. *Id.* The Court did not establish a *per se* rule that hospitalization for *any* condition constitutes a record of disability.[6] Indeed, there are many injuries that require hospitalization but that would not give

(...continued)

  (1)  A "First Report of Injury or Illness" form, filed with the Texas Industrial Accident Board in 1988, which states that Moody fell at work and felt "discomfort in her back."

  (2)  A 1985 letter from her doctor describing her treatment following her first workplace fall. (The letter also states, "The extent of her injuries is not considered severe. Prognosis for full recovery is excellent.")

  (3)  Kellogg's employee data sheet stating that Moody was terminated in 1985 "due to long term illness (disability)."

  (4)  A letter from Moody's lawyer, James Potts, indicating that she had been released to work with certain limitations, and inquiring as to her work status.

  (5)  A 1986 Kellogg "separation report" form that included the notation "long term disability" in the space for comments.

None of these documents indicates that Moody ever had an impairment that substantially limited a major life activity, and the documents thus cannot establish a "record of disability" as that term is defined by the ADA. *See* C.F.R. § 1630.2(k) ("*Has a record of such impairment* means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.").

  [6] *See Evans v. Dallas*, 861 F.2d 846, 852-53 (5th Cir. 1988) (holding that knee injury, which required surgery, was not a disability); 29 C.F.R. § 1630 app. at § 1630.2(j) (noting that appendicitis, which generally requires hospitalization, is a temporary injury and not a disability).

rise to a record of substantial impairment sufficient to convey ADA protection.

3.

Finally, Moody has not produced evidence that would permit a finding that Kellogg regarded her as disabled at the time it took the "adverse employment actions." One is regarded as having a disability only if he (1) has an impairment that is not substantially limiting but that the employer perceives as substantially limiting; (2) has an impairment that is substantially limiting only because of the attitudes of others toward the impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment. *Burch v. Coca-Cola Co.*, 119 F.3d 305, 322 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 871 (1998). Moody does not claim to fall into the second category, so she must show that Kellogg perceived that she was impaired in a way that is substantially limiting.

The evidence Moody points to as establishing that Kellogg perceived her as disabled is insufficient. Her most persuasive evidence is probative only of Kellogg's perceptions in 1986. She points to documents from her 1986 termination that appear to indicate that the reason for her termination was disability.[7]

_____

[7] Kellogg claims that these documents were related to Moody's application in 1986 for long-term disability benefits under the company's disability-benefits plan. The use of the term "disability," Kellogg maintains, indicates that Moody, for a period of time in 1986, may have qualified for benefits under Kellogg's long-term disability plan.

Kellogg's assertion is persuasive. The handwritten memo referring to
(continued...)

10

These documents do not establish that Kellogg perceived Moody as disabled *in 1994*, when it took the adverse employment actions complained of.[8]

The remaining evidence to which Moody points cannot sustain a finding that Kellogg perceived Moody as disabled in 1994. Moody points to Frisby's notes that include the phrase "consider her disabled." This document is simply a piece of paper with three handwritten phrases: "fabrication on her partSSfalsifying time sheets," "consider her disabled," and "who's in group." Frisby jotted down the notes before the conversation in which she fired Moody, and Frisby maintains that the phrase "consider her disabled" was a reminder that Moody might take the position that she (Moody) was disabled. This testimony is corroborated by human resources employee Teresa Vannoy, who testified that she and Frisby discussed various theories that might come up in connection with Moody's termination, including the "disability issue."[9] Frisby also stated

---

(...continued)
"termination due to long term sickness (disability)" explains, "FYI the insurance carrier is evaluating Moody's application for disability." We need not resolve what the references to disability meant, however, for Kellogg's belief about Moody in 1986 is not relevant to whether it perceived her as disabled in 1994.

[8] In addition, it is worth noting that the ADA, enacted in 1986, transformed the legal meaning of "disability." The fact that Kellogg in 1986 referred to Moody's injury as a disability does not indicate that it believed, even then, that she was subject to an impairment that substantially limited a major life activity.

[9] Vannoy stated:

[Frisby and I] had a conversation about some other issues that might come up [regarding] the recommendation to terminate Jo Ann [Moody] . . . . And one of them was the disability issue, and we discussed whether or not Jo Ann fit under the definition of the law. And we decided that she didn't . . . . [T]he reason why we were talking about that was . . . because Jo Ann had been out for a few days and
(continued...)

11

in her deposition and affidavit that she neither perceived Moody as "disabled" nor took her back condition into account in making the termination decision. Given the totality of the evidence in the summary judgment record, the solitary statement in Frisby's notes fails to raise a genuine issue of material fact as to whether Kellogg perceived Moody as substantially limited in a major life activity.

Moody points to the deposition testimony of Carol Jones, an employee who worked under her, as establishing that other employees thought she had some type of disability, but that evidence is insufficient for two reasons. First, the workplace comments of co-workers, who were not decision makers at the company, are nothing more than stray remarks and cannot establish how Kellogg perceived Jones. *See Stendebach v. C.P.C. Int'l Inc.*, 691 F.2d 735, 738 (5th Cir. 1982). In addition, a full reading of Jones's deposition indicates that Jones was using the term "disability," a term of art, to refer to any physical limitation, not simply to an "impairment that substantially limits a major life activity." Admitting that she never talked directly to any of Moody's supervisors about Moody's disability, Jones testified only that a supervisor had said "something like" Jo Ann was disabled and would need help lifting boxes.

At most, the testimony establishes that some employees

---

(...continued)
        was coming back, and we anticipated that she might raise that as an
        issue. We knew that it wasn't part of the decision we were making
        andSSbut, you know, we wanted to beSSI wanted [Frisby] to be aware
        of the risk involved and that Jo Ann could raise the issue . . . .

believed Moody had limitations on her ability to do heavy lifting. Because a limitation on heavy lifting is not a substantial limitation of a major life activity under the ADA, a perception that an employee has a heavy lifting limitation cannot amount to a perception that the employee is disabled. *See Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1119-20 (5th Cir. 1998); *Ray*, 85 F.3d at 229 (5th Cir. 1996).

Finally, Moody points to evidence indicating that Frisby and Vannoy were aware that Frisby had experienced injuries and had filed workers' compensation claims. This evidence can show only that Kellogg perceived Moody as having been injured—not as having a disability as defined by the ADA. An injury—even one requiring surgery—does not necessarily constitute a disability.[10]

B.

Moody's ADA claim fails also because she has produced no evidence to sustain a finding that Kellogg took an adverse employment action solely because of her disability. *See Rizzo*, 84 F.3d at 763 (5th Cir. 1996) (listing elements of ADA claim); *see also Chandler*, 2 F.3d at 1390. Moody points to two discriminatorily-motivated adverse employment actions: Kellogg's failure to give her a parking space close to the building and the decision to fire her.[11] Neither action, however, constituted

---

[10] *See Rogers v. International Marine Terminals*, 87 F.3d 755, 759 (5th Cir. 1996); *Evans*, 861 F.2d at 852-53; 29 C.F.R. § 1630 app. at § 1630.2(j).

[11] Moody's brief also refers to the failure to accommodate her "disability"

(continued...)

adverse employment action based solely on Moody's "disability."

## 1.

Kellogg's failure to provide Moody with a parking space close to the building was not a failure reasonably to accommodate her "disability," because the evidence cannot establish that she requested a close parking space. She testified at her deposition that she did not recall talking to anyone at Kellogg about a request for a parking accommodation and that she never applied for a decal that would permit her to park in one of the disabled parking spaces. As the ADA regulations state, "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." 29 C.F.R. app. § 1630.9. Moody's failure to make a specific request precludes her from arguing that Kellogg did not accommodate her "disability."[12]

## 2.

The summary judgment evidence also supports a finding that Kellogg terminated Moody not because of her "disability" but

---

(...continued)
by providing her with a special chair. When questioned about her accommodation claims at her deposition, however, Moody admitted that Kellogg did provide her a special chair in 1986 and again in 1994 but that she did not have an opportunity to use the chair in 1994 because of her termination.

[12] Moody's position is that her doctor's recommendation of a closer parking spot constituted a request for an accommodation. As the district court found, however, Moody's doctor merely "recommended" a closer parking space; he did not indicate that one was required. Kellogg's records indicate that the company informed Moody that her doctor would need to indicate that a closer space was required before it would allow her to park in one of the close spaces. There is no evidence suggesting that she tried to obtain such a "prescription" from her doctor.

14

because it believed she was directing subordinates to falsify time sheets.[13]  Moody's termination stemmed from allegations by Carol Jones, one of her subordinates, who stated that Moody had directed her to add hours to her time sheet that she had not worked. Specifically, Jones stated that she had accompanied Moody on personal errands during the work week; that, on August 26, 1994, Jones submitted to Moody a time sheet of hours worked; that Moody crossed out Jones's actual hours and added three hours of overtime that Jones had not worked; and that Moody instructed Jones to complete a new time sheet with the revised numbers.

Jones said this was not the first time Moody had directed her to add hours to her time sheet.  In support of her allegations, Jones showed Frisby the original August 26 time sheet containing Moody's markings and revisions.

After Jones came forward with her allegations, Frisby contacted Vannoy, and they investigated Jones's allegations, concluding that Jones was a credible person and that parking garage records corroborated her allegations that Moody had left Kellogg's

---

[13] In a disability discrimination case in which, as here, there is no direct proof of discrimination, the plaintiff must present *prima facie* evidence of discrimination on the basis of disability, after which the employer has the burden to articulate some legitimate, nondiscriminatory reason for the termination, and the burden then shifts to the plaintiff to prove by a preponderance of the evidence that the employer's proffered reason was a pretext for discrimination. *See Sherrod*, 132 F.3d at 1121 (approving the title VII burden-shifting scheme for ADA claims); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973) (establishing burdens of proof for title VII claims).  Kellogg articulated a nondiscriminatory reason for Moody's termination (*i.e.*, that Moody was directing her subordinates to falsify time sheets), and Moody thus has the burden of proving that this proffered reason is pretextual.  As we will discuss, she has not sustained that burden.

15

premises when Jones claimed she had.[14]  In addition, Frisby and Vannoy heard from Vanessa Reed, another subordinate of Moody's, that Moody "as a supervisor" told Reed to add hours to her time sheets that Reed had not worked.[15]

Moody claims that the manner in which the investigation was conducted indicates that Kellogg's stated reason was pretextual. She claims the investigation was tainted because Kellogg should have better investigated the parking records and because Frisby intimidated employees into making statements against her.  We disagree that these contentions establish pretext.

Moody's assertion that Kellogg's failure to do more to investigate her side of the story indicates that the stated reason

---

[14] Moody insists that Frisby and Vannoy should have given her a chance to explain her parking record, because she car pooled with another person, and the recorded exits from the garage could have been made by that colleague.  Moody misapprehends the significance of the parking records.  They indicate that her car left precisely when Jones claimed to have gone on errands with her.  Frisby and Vannoy did not use the parking records simply to see whether Moody's car was absent during the work week; rather, they used them to corroborate Jones's story that Moody left, with Jones in the car, at particular times.

[15] Moody asserts that Reed's statement could not have provided support for her termination, because the statement was "tainted" by the fact that when Frisby took Reed's statement, Frisby advised Reed that Moody was no longer with Kellogg.  But Reed's deposition indicates that Reed gave her statement before she was told that Moody had been fired:

> MR. POTTS (Moody's Attorney):  . . . [W]hat I'm really trying to find out, Ms. Reed, is whether at that meeting you were informed that they were going to fire Jo Ann Moody, regardless of what you said or whether or not your signed statement would help them, then they would fire Jo Ann Moody.  Do you understand what I'm getting at?

> REED:  Well, I wasn't told any of that.  I was just told to give the statement.  And I gave my statement and they said are you awareSS"Are you aware that Jo Ann Moody is no longer an employee at Kellogg?"

This discussion shows that Reed gave her statement *before* she knew Moody was going to be fired.  Moreover, Frisby's deposition testimony indicates that Frisby took Reed's statement before Vannoy and Frisby terminated Moody, and the fact that Reed's handwritten and signed statement is dated 8:35 a.m., September 6, 1994 (the day Moody was fired), corroborates Frisby's testimony.

16

was pretextual fails for two reasons. First, it rests on the mistaken notion that Kellogg's decision to fire Moody is lawful only if it proved she had engaged in improprieties. Kellogg needed only to base its termination decision on a good-faith belief that Moody had abused her supervisory position in violation of company policy.[16] It did not need to undertake heroic efforts to ensure that its investigation was flawless.

Moreover, Moody misunderstands the role of the parking records. The records showing that Moody's car left Kellogg's premises during the work week were not, by themselves, the basis for the termination; they merely corroborated Jones's allegation that Moody and Jones had left work during hours the women's time sheets showed they worked. Given this limited role, Kellogg did not need to ask Moody about the parking records to form a reasonable, good faith belief that Jones was telling the truth.

Moody's claim that Frisby's "intimidation" of employees indicates a lack of good faith is also unavailing. Frisby may well have used questionable tactics in questioning some Kellogg employees about Moody's alleged misconduct. Kellogg's decision to fire her was not based on coerced testimony, however,[17] but on

---

[16] *See Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir. 1977), *overruled in part on other grounds*, 647 F.2d 513 (5th Cir. May 1981) (holding that employer's action based on "honest belief" that the plaintiff violated time card policy did not constitute unlawful discrimination, even if employer's belief was based on inaccurate information); *Corley v. Jackson Police Dep't*, 566 F.2d 994, 1003 n.14 (5th Cir. 1978) ("[W]here an employer wrongly believes that an employee has violated company policy, [the employer] does not discriminate in violation of Title VII if it acts on this belief.").

[17] The evidence reflects that Frisby may have indicated to Sherry Dancer and Vanessa Reed that they would be terminated if they did not give a statement
(continued...)

17

Jones's allegations, corroborated by the marked-up time sheets and the parking records, and on Reed's statement.

The evidence compels the conclusion that Kellogg had a nondiscriminatory business reason for terminating Moody, and Moody has not produced evidence that would permit a rational juror to find pretext. Hence, she cannot prove a discriminatorily motivated adverse employment action, and her ADA claim would fail even if she had a statutory disability, which she does not.

V.

The court properly granted summary judgment on Moody's workers' compensation retaliation claim, because she has not produced sufficient evidence to establish a causal connection between her filing a claim and Kellogg's decision to fire her. Section 451 of the Texas Labor Code forbids discrimination against employees who engage in specific protected activity, including filing workers' compensation claims. *See* TEX. LABOR CODE § 451.001; *Burfield v. Brown, Moore & Flint, Inc.*, 51 F.3d 583, 589 (5th Cir. 1995). To prevail on a § 451 claim, an employee must establish that his participation in one of the specified types of protected activity motivated the employer to discharge or otherwise

---

(...continued)
supportive of the case against Moody. Reed, however, expressly stated that fear of losing her job did not influence her statement, and Dancer's statement was not part of the basis of Kellogg's decision to fire Moody. At any rate, Jones's unsolicited allegations, corroborated by the marked-up time sheets and the parking records, gave Kellogg a sufficient reason for firing Moody.

18

discriminate against him.[18]  Moody would have to establish that her

filing the workers' compensation claims was a "but for" cause of

Kellogg's decision; she would have to show that her "protected

conduct [was] such that, without it, the employer's prohibited

conduct would not have occurred when it did."  *Continental Coffee

Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).[19]  This she

cannot do.

Moody first attempts to create a fact issue on causation by

claiming that Marianne Fulghum, the engineering documentation

supervisor, told Moody's co-worker, Pamela Vance, that, if it were

not for Moody and Vance (who also had filed a compensation claim),

the department would have a perfect safety record.  This statement,

which is a fact, is insufficient to constitute a causal connection

between Moody's filing of a claim and her termination.  There is no

nexus between Fulghum's comment and Frisby's decision to terminate

Moody's employment, and the comment is but a stray remark that

---

[18] *See Burfield*, 51 F.3d at 589 (*citing Swearingin v. Owens-Corning Fiberglass Corp.*, 968 F.2d 559, 561 (5th Cir. 1992)).

[19] Moody's brief cites a number of cases holding that circumstantial evidence may establish causation and stating that an employee may prevail on the issue of causation if he can establish that his protected activity contributed to, but was not necessarily a "but for" cause of, the termination.  All these cases preceded *Cazarez*, however.  Moody's brief does not even mention *Cazarez*, the Texas Supreme Court's controlling case on the causation requirement under § 451.

Moody's reply brief then misconstrues Kellogg's brief as contending that *Cazarez* holds that the employee's protected activity must be the sole cause of the termination.  Kellogg actually asserted§§correctly§§that *Cazarez* requires a § 451 plaintiff to establish only *but for* causation.  Moody's initial brief had asserted that Moody need only establish that her filing for workers' compensation contributed to Kellogg's decision to fire her.  Moody's counsel are advised to be more careful in the future.

cannot support causation.[20]

Moody next points to Vance's statement, made in an affidavit submitted after Vance was terminated, that Vance believed her discharge was retaliatory. Vance stated, "I am of the opinion that I was terminated because . . . I had sustained an on the job injury that had resulted in the filing of a workers' compensation claim." Moody reasons that this statement, which shows that Kellogg engaged in retaliatory discharge in other cases, raises a fact question as to whether Kellogg had terminated Moody with retaliatory motives. But Vance's conclusionary and speculative affidavit would not constitute competent evidence of causation in *her own* case[21] and certainly cannot create an issue of material fact regarding Moody's claim.

Moody's attempt to prove *but for* causation using "statistics" regarding the percentage of workers' compensation claimants who leave Kellogg is similarly unavailing. Moody notes that from October 22, 1991, to June 20, 1994, 27 clerical and administrative personnel similarly situated to Moody filed workers' compensation claims and that by August 30, 1996, 21 of them, or 77.7 per cent, were no longer with the company. This evidence, however, is insufficient to raise a fact issue as to causation. Moody makes no

---

[20] *See Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir. 1995) (stating that vague and remote comments are insufficient to establish discrimination).

[21] *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (recognizing that it is "well settled that an employee's subjective belief . . . without more, is not enough to survive a summary judgment motion"); *Texas Division-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994) (holding that an employee's "subjective beliefs are no more than conclusions and are not competent summary judgment evidence").

comparison between the attrition rate of workers' compensation claimants and that of *all* similarly situated employees.  Moreover, she does not analyze the reasons for the termination of the workers' compensation claimants; indeed, ten of the twenty-one resigned voluntarily.

Moody cannot create a fact issue as to causation on the basis of the fact that similarly situated employees were not disciplined or discharged for time sheet improprieties, because the employees to whom Moody refers did not engage in the same misconduct as did she.[22]  The record suggests that Judy Gaedchens may have permitted employees to work through lunch to make up time missedSSadmittedly a violation of Kellogg's time policies.  There is no evidence, however, that Gaedchens told anyone to augment time sheets with hours that were never worked.  The impropriety Moody apparently committed is graver than  Gaedchens's, and it therefore not discrimination for Kellogg to take actions against Moody but not Gaedchens.

Finally, Moody attempts to create a fact issue as to causation by noting that she was fired the day she presented her doctor's slip returning her to full-time duty.  This evidence is insufficient to sustain a finding of a causal nexus between her

---

[22] The record does not support Moody's claim that Judy Gaedchens, Vanessa Reed, or Sherry Dancer engaged in the same misconduct as did Moody.  First of all, Reed and Dancer were not supervisors and thus could not engage in abuse of supervisory authority.  Moreover, the deposition testimony of the three employees indicates that any misconduct by Gaedchens was different from Moody's.  Reed testified that Moody directed her to write down time that Reed had not worked and that Gaedchens never gave a similar instruction.  Likewise, Dancer testified that Gaedchens permitted Dancer to work through lunch to make up time missed; Dancer did not testify that Gaedchens told Dancer to add time to her time sheet that was never worked.  Gaedchens agreed that this was her practice.

workers' compensation claims and her termination.[23]  The cases finding the timing of the adverse employment decision to be circumstantial evidence of causation have looked to the temporal proximity of the *injury* or *workers' compensation filing* to the date of the adverse employment action.[24]  Moody was fired over six months after her injury and her final workers' compensation filing. Hence, the timing of the termination does not create a material fact issue regarding the causal nexus between her workers' compensation claim and her termination.

In addition, as stated above, the summary judgment record compels the conclusion that Kellogg had a legitimate, nondiscriminatory business reason for terminating Moody: a reasonable, good faith belief that she was abusing her supervisory authority.  Even if she could establish a causal link between her termination and her filing for compensation, Kellogg's nondiscriminatory reason for terminating her would rebut the alleged discrimination.  *See Burfield*, 51 F.3d at 590.

AFFIRMED.

---

[23] Moody cites *Carnation Co. v. Borner*, 610 S.W.2d 450, 451 (Tex. 1980), in support of her claim that the timing of her dismissal establishes causation. *Borner*, however, never discusses causation.

[24] *See*, *e.g.*, *Burfield*, 51 F.3d at 590; *Worsham Steel Co. v. Arias*, 831 S.W.2d 81, 82 (Tex. App.SSEl Paso 1992, no writ) (finding a retaliatory motive where an employer terminated an employee a few days after injury, specifically to deny the employee the opportunity to file a claim); *Chemical Express Carriers, Inc. v. Pina*, 819 S.W.2d 585, 590 (Tex. App.SSEl Paso 1991, writ denied) (finding a retaliatory motive where discharge occurred only one month after compensation claim was filed).